UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| Global Consolidated Trading, Inc.<br><br>              Plaintiff,<br>v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States*; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner of United States Customs and Border Protection*; JAMIESON GREER, *in his official capacity as United States Trade Representative*; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; HOWARD LUTNICK, *in his official capacity as Secretary of Commerce*; KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*; SCOTT BESSENT, *in his official capacity as Secretary of the Treasury*<br><br>              Defendants. | Case No. 25-800 |

## COMPLAINT

### INTRODUCTION

1. In 2025, the President issued a sequence of executive directives declaring national emergencies and imposing broad tariffs on imports from nearly every nation. Those directives are challenged here as unlawful and unconstitutional.

2. The President relies on the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ et. seq., as the statutory authority for these duties. IEEPA, however, does not confer authority to impose tariffs, and Congress never delegated such a power to the President. The challenged measures therefore exceed statutory authority and infringe the Constitution's allocation

1

of legislative power over duties and foreign commerce.

3. The declared emergencies do not meet IEEPA's requirement of an "unusual and extraordinary threat." They are grounded in ordinary economic conditions—such as longstanding trade deficits—and cannot support emergency tariff actions. The President's use of IEEPA to impose tariffs is therefore unlawful.

4. Even if IEEPA could be interpreted to permit tariffs, construing it to allow the expansive, open-ended tariff power claimed here would raise grave constitutional problems. Such a reading would constitute an unconstitutional surrender of Congress's legislative prerogatives under Article I, Section 8.

5. The challenged executive measures have caused, and will continue to cause, substantial economic injury to U.S. importers, including Plaintiff, who have been forced to pay duties not authorized by statute, rework supply chains, and absorb losses stemming from action taken without congressional authorization.

6. Plaintiff brings this suit to obtain a judicial declaration that the tariffs are unauthorized, to secure refunds of duties paid under the challenged orders, and to enjoin further collection. Even if other litigation (e.g., *V.O.S. Selections, Inc. v. Trump* and *Learning Resources, Inc. v. Trump*) results in rulings that the tariffs are unauthorized, those decisions may not guarantee refunds for all affected importers, making this action necessary for Plaintiff to obtain complete relief.

7. Plaintiff respectfully requests that the Court hold the challenged actions unlawful, vacate the tariffs imposed under them as applied to Plaintiff, enjoin further enforcement, and order the refund of unlawful duties.

## JURISDICTION

8. The Court of International Trade has exclusive jurisdiction under 28 U.S.C. § 1581(i) over civil actions against the United States, its agencies, or officers that arise under laws providing

for:

(A) revenue from imports or tonnage;

(B) tariffs, duties, fees, or taxes on importation for reasons other than raising revenue;

(C) embargoes or quantitative import restrictions (other than health/safety measures); or

(D) administration and enforcement of the foregoing.

28 U.S.C. § 1581(i)(1).  See *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1365–66 (Ct. Int'l Trade 2025), aff'd, 149 F.4th 1312 (Fed. Cir. 2025).

9. The Court possesses the powers in law and equity comparable to those of a United States district court and may enter money judgments and other appropriate relief in actions under 28 U.S.C. §§ 1581–1582.  See 28 U.S.C. §§ 1585; 2643(a)(1), (c)(1).

10. The Court may adjudicate challenges to presidential directives through lawsuits against subordinate officials tasked with implementing those directives.  28 U.S.C. § 1581(i); *V.O.S. Selections*, 772 F. Supp. 3d at 1367 (quoting *USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1366 (Fed. Cir. 2022)).

## PARTIES

11. Plaintiff Global Consolidated Trading, Inc. is incorporated in Virginia with its principal place of business in McLean, VA.  It sources imported products from numerous foreign countries, including China, Vietnam, Malaysia and Thailand, among others.

12. Plaintiff depends on a steady flow of imports from foreign countries to supply its business and customers.

13. The tariffs imposed under the executive orders challenged here have been applied to Plaintiff's imported goods, forcing Plaintiff to pay duties beyond lawful levels.

3

14. Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

15. Defendant Executive Office of the President is an agency of the United States government that oversees presidential directives and supervises the Office of the United States Trade Representative.

16. Defendant United States of America is the sovereign government of the United States.

17. Defendant United States Customs and Border Protection ("CBP") is an agency within the Department of Homeland Security charged with administering and enforcing collection of tariffs, duties, and other import restrictions under the Harmonized Tariff Schedule of the United States.

18. Defendant Rodney S. Scott is Commissioner of CBP and is sued in his official capacity.

19. Defendant Jamieson Greer is the United States Trade Representative and is sued in his official capacity.

20. Defendant Office of the United States Trade Representative ("USTR") is a component of the Executive Office of the President that develops and coordinates U.S. international trade policy.

21. Defendant Howard Lutnick is the Secretary of Commerce and is sued in his official capacity.

22. Defendant Kristi Noem is the Secretary of Homeland Security and is sued in her official capacity; DHS (through CBP) implements the challenged directives.

23. Defendant Scott Bessent is the Secretary of the Treasury and is sued in his official

capacity; Treasury participates in consultation on tariff implementation.

## TIMELINESS AND STANDING

24. The suit is timely under the two-year limitation applicable to actions against the United States arising from import-related matters. See 19 U.S.C. § 1621.

25. To establish standing, a plaintiff must show injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

26. Plaintiff has sustained concrete economic injury because it imported goods subject to the challenged orders and paid additional duties as a direct result of the HTSUS modifications made pursuant to those orders. See *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021); *Hein v. Freedom from Religion Found.*, Inc., 551 U.S. 587, 599 (2007).

27. A favorable judicial ruling declaring the tariffs unlawful and ordering refunds and injunctive relief will redress Plaintiff's injuries by halting further duty obligations and restoring amounts already paid.

## BACKGROUND AND FACTUAL ALLEGATIONS

### A. National Emergencies and IEEPA Mandates

28. Congress enacted the National Emergencies Act ("NEA") to define and limit emergency powers. NEA requires the President to publish a declaration in the Federal Register, transmit notice to Congress, identify the statutes he intends to invoke, and periodically renew or terminate the emergency. NEA also provides expedited procedures for Congress to terminate an emergency.

29. IEEPA authorizes the President, once an NEA-compliant emergency has been declared, to regulate certain international economic transactions aimed at addressing an "unusual and extraordinary threat" with a substantial foreign source to U.S. national security, foreign policy,

5

or the economy. IEEPA's authority is tied to the specific threat identified and does not itself furnish a general tariff-making grant.

30. On February 1, 2025, the President issued executive orders imposing tariffs on imports from Canada, Mexico, and China.

31. Executive Order 14194, Imposing Duties To Address the Situation at Our Southern Border, 90 Fed. Reg. 9,117 (Feb. 7, 2025), imposed an additional 25% duty on products from Mexico based on a declared emergency tied to border security and illicit drug flow.

32. Executive Order 14193, Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 9,113 (Feb. 7, 2025), imposed a 25% tariff on Canadian imports citing opioid trafficking as an emergency.

33. Executive Order 14195, Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9,121 (Feb. 7, 2025), declared a national emergency over synthetic opioids and imposed an additional 10% ad valorem duty on China-origin goods effective February 4, 2025.

34. On March 3, 2025, the President issued Executive Order 14228, Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 11,463 (Mar. 7, 2025), which raised the incremental China tariff to 20%.

35. On April 2, 2025, Executive Order 14257, Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits, 90 Fed. Reg. 15,041 (Apr. 7, 2025) (the "Reciprocal Tariff" or "Liberation Day" Order), imposed a baseline 10% ad valorem duty on products from nearly all countries effective April 5, 2025, and additional country-specific rates on 57 trading partners effective April 9, 2025.

36.     The country-specific rates in the Liberation Day Order ranged from 11% up to 50%.

37.     The Liberation Day Order characterized the collection of bilateral trade imbalances, disparate tariff structures, non-tariff barriers, and foreign economic policies that depress wages and consumption—manifested in large, persistent U.S. goods trade deficits—as an "unusual and extraordinary threat" to national security and the United States economy.

38.     Unless stated otherwise, the Liberation Day Order applied to goods entered for consumption or withdrawn from warehouse beginning 12:01 a.m. EDT on April 9, 2025, subject to a limited "on the water" exemption for goods loaded at foreign ports before that cutoff, with enumerated exceptions.

39.     On April 9, 2025, Executive Order 14266, Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment, 90 Fed. Reg. 15,625 (Apr. 15, 2025), suspended for 90 days most of the higher country-specific rates (except for China), while maintaining the global 10% baseline. That order also raised China's reciprocal rate dramatically (to 125%).

40.     On April 11, 2025, the President issued a Memorandum clarifying carve-outs and exceptions, including for certain HTSUS headings such as semiconductors.

41.     Through mid-2025, the administration issued follow-on guidance and orders adjusting timing, suspensions, and rate modifications.

42.     On July 30, 2025, Executive Order 14323, Addressing Threats to the United States by the Government of Brazil, 90 Fed. Reg. (Aug. 5, 2025), the President declared a national emergency and imposed an additional 40% duty on products of Brazilian origin, citing a foreign political prosecution as the basis for emergency action.

43.     On July 31, 2025, Executive Order 14326, Further Modifying the Reciprocal Tariff Rates, 90 Fed. Reg. 37,963 (Aug. 5, 2025), reinstated country-specific reciprocal rates with

minimum tariffs of 10% for various trading partners.

44.     Also on July 31, 2025, the President issued a separate order increasing the Canada-specific tariff to 35%.

45.     On August 6, 2025, Executive Order 14329, Addressing Threats to the United States by the Government of the Russian Federation, 90 Fed. Reg. (Aug. 27, 2025), purported to impose a 25% tariff on imports from India for alleged connections to imports of Russian oil.

46.     The Liberation Day Order and all of the above mentioned Executive Orders (together, the "Challenged Orders") cite IEEPA, the NEA, section 604 of the Trade Act of 1974 (19 U.S.C. § 2483), and 3 U.S.C. § 301 as statutory grounds.

47.     None of those statutes independently authorizes the President to impose tariffs in the sweeping manner undertaken here; statutory authority, where it exists, must be supported by a genuine emergency, not mere policy disagreement.

B.     **Non-Delegation and Executive's Lack of Power to Tariff**

48.     The Constitution assigns to Congress the power "to lay and collect taxes, duties, imposts and excises" and "to regulate commerce with foreign nations." U.S. Const. Art. I, § 8, cls. 1, 3.

49.     Title 19 of the U.S. Code— "Customs and Duties"—is where Congress sets out tariff authorities; IEEPA (Title 50) contains no explicit grant empowering the President to set tariffs or duties.

50.     Congress has explicitly conferred presidential tariff-adjustment authority in narrow statutes when intended (e.g., 19 U.S.C. § 1862 for national-security-based adjustments). The President cannot circumvent those statutory constraints by invoking IEEPA. See *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 125 (2022) (Congress does not "hide elephants in

mouseholes").

51. Other statutory mechanisms allow specific types of tariff action (e.g., 19 U.S.C. § 2411 for remedies where trading partners violate agreements; 19 U.S.C. § 2251 for transitional relief for industries).

52. IEEPA authorizes the President to investigate, regulate, or prohibit certain international financial and property transactions, including foreign-exchange dealings, transfers of credit and payments, import/export of currency and securities, and transactions involving property in which a foreign country or national has an interest.  See 50 U.S.C. § 1702.

53. IEEPA expressly conditions the exercise of its powers on the existence of an "unusual and extraordinary threat" that has been the subject of a national emergency declaration, and it states those powers "may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

54. The term "tariff" does not appear in IEEPA, nor does the statute otherwise identify a power to lay and collect duties.

55. Historically, no President aside from the current administration has relied on IEEPA to impose tariffs, and earlier attempts were withdrawn before full implementation or substantive judicial review.

56. The Liberation Day Order's asserted "unusual and extraordinary threat" is based on longstanding trade imbalances and related economic phenomena that are not new, unusual, or unexpected.

57. The United States has experienced persistent trade deficits across many years, including bilateral deficits with numerous countries.

58. A trade deficit alone does not constitute an emergency; it often reflects consumer preferences and is associated with capital inflows that can benefit the U.S. economy.

59. Section 604 of the Trade Act of 1974 (19 U.S.C. § 2483) directs the President to reflect relevant statutory actions in the HTSUS "from time to time" but functions primarily as an administrative instruction to update tariff schedules rather than as a source of new unilateral tariff-making power.

60. The NEA sets procedural requirements for declaring emergencies and requires the President to identify the statutory provisions he intends to use; it does not supply substantive authority to impose tariffs. See 50 U.S.C. § 1631.

61. 3 U.S.C. § 301 provides the President with general authority to delegate functions to subordinates; it does not create independent tariff authority.

62. The Supreme Court has pending appeals concerning the lawfulness of IEEPA-based tariff orders: *V.O.S. Selections, Inc. v. Trump*, No. 25-250; *Learning Resources, Inc. v. Trump*, No. 24-1287 (oral argument held Nov. 5, 2025).

63. On May 28, 2025, the Court of International Trade held in *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025), that the President exceeded IEEPA authority by imposing tariffs and permanently enjoined enforcement of the IEEPA duties.

64. On August 29, 2025, the Federal Circuit, sitting *en banc*, affirmed that decision. *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025).

65. The Federal Circuit concluded Congress did not clearly delegate tariff authority to the President under IEEPA and noted serious constitutional concerns under the major-questions and nondelegation doctrines.

66. The D.C. District Court in *Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025), likewise held that IEEPA does not authorize tariffs.

67. Even if higher courts eventually find the tariffs unlawful, importers who have

already paid duties—like Plaintiff—are not guaranteed refunds without their own judgments. See *In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1365–66 (Ct. Int'l Trade 2021); *Target Corp. v. United States*, 134 F.4th 1307, 1316 (Fed. Cir. 2025).

68. As a result of the executive orders challenged by this lawsuit, Plaintiff has paid IEEPA duties to the United States and thus has suffered injury caused by those orders.

## CLAIMS FOR RELIEF

### COUNT I — PRESIDENTIAL ACTIONS EXCEED STATUTORY AUTHORITY

69. The allegations of paragraphs 1 through 68 are incorporated by reference and restated as if fully set forth herein.

70. Any clear delegation to the President to impose worldwide tariffs would need unmistakable congressional language; Congress rarely, if ever, confers vast regulatory authority by implication. See *Nat'l Fed'n of Indep. Bus v. OSHA*, 595 U.S. 109, 125 (2022) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).

71. IEEPA contains no reference to tariffs or duties and gives no indication that Congress intended to grant the President power to lay and collect tariffs.

72. There is no historical practice of Presidents using IEEPA to impose tariffs in a sustained or judicially supported manner.

73. Trade deficits do not, by themselves, constitute an IEEPA-level national emergency.

74. Political prosecutions in foreign countries do not, without additional extraordinary circumstances, create the kind of "unusual and extraordinary threat" IEEPA contemplates.

75. Courts approach claims of major regulatory authority arising out of long-standing statutes with skepticism. *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014).

76. IEEPA was enacted to restrict excessive executive emergency authority and should not be read as a blanket grant of tariff power.

77. Where Congress intends to empower the President to alter tariff policy, it has done so explicitly in Title 19; the President may not circumvent those narrow delegations by invoking IEEPA.

78. The President's statutory interpretation is not entitled to deference where courts must determine the best reading of the statute. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024).

79. For all these reasons, IEEPA does not authorize the President to impose tariffs; the Challenged Orders thus exceed statutory authority and are unlawful as applied to Plaintiff.

80. This Court and the Federal Circuit have already held these specific IEEPA-based tariffs unlawful. See *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025), aff'd, 149 F.4th 1312 (Fed. Cir. 2025).

81. The tariffs imposed under the Challenged Orders have caused and continue to cause irreparable economic injury to Plaintiff.

**COUNT II — IF IEEPA IS READ TO ALLOW BROAD TARIFFS, THE STATUTE VIOLATES THE NONDELEGATION PRINCIPLE**

82. The allegations of paragraphs 1 through 81 are incorporated by reference and restated as if fully set forth herein.

83. Article I, Section 1 vests all legislative power in Congress; the nondelegation doctrine protects this allocation by preventing Congress from transferring essential legislative functions without adequate standards. U.S. Const. art. I, § 1; *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

84. Delegations must contain an intelligible principle to guide the exercise of delegated authority so that courts and the public can evaluate compliance. See *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935); Gundy v. United States, 588 U.S. 128, 158 (2019) (Gorsuch, J., dissenting).

85. If IEEPA were read to permit the sweeping tariff authority the Government claims, that would amount to an impermissible delegation lacking any intelligible standard.

86. Such a delegation would be historically sweeping and would resemble delegations the Supreme Court invalidated in the *Schechter* and related cases.

87. The Government's theory would allow the President to impose massive economic burdens without guidance on when or how to act—an outcome the Constitution forbids. *Indus. Union Dep't, AFL–CIO v. API*, 448 U.S. 607, 645 (1980); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001).

88. IEEPA provides no workable standard for the imposition of tariffs; treating it as granting open-ended tariff power would raise serious nondelegation concerns.

89. The tariffs imposed pursuant to such an unconstitutional delegation cause concrete and continuing injury to Plaintiff.

## COUNT III — DECLARATORY RELIEF

90. The allegations of paragraphs 1 through 89 are incorporated by reference and restated as if fully set forth herein.

91. This Court may enter declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

92. Federal courts may use equitable powers to enjoin unconstitutional actions by federal officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *Chamber of*

*Commerce of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

93. An actual controversy exists as to whether IEEPA authorizes the challenged tariffs, whether IEEPA would be constitutional if construed to permit such tariffs, and whether CBP may implement and collect duties based on the Challenged Orders.

94. Plaintiff is an importer of record that has paid duties under the Challenged Orders and therefore has suffered concrete injury.

95. The Challenged Orders are *ultra vires* because IEEPA does not authorize tariff imposition; alternatively, they are *ultra vires* because the Orders exceed any narrow statutory grant.

96. Because the Orders are *ultra vires* and the HTSUS modifications unlawful, Defendants lack authority to enforce them against Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in its favor and grant the following relief:

a) A declaration that IEEPA does not authorize the President to unilaterally impose tariffs;

b) A declaration that the President has not identified a valid national emergency under IEEPA and that persistent trade deficits alone do not qualify as such an emergency;

c) A declaration that the President has failed to show an "unusual and extraordinary threat" as required by IEEPA;

d) A declaration that any purported congressional grant of unilateral authority to impose global tariffs at the President's discretion would be an unconstitutional delegation of legislative power;

e) A declaration that the Challenged Orders are *ultra vires*, unlawful, and *void ab initio* as

applied to Plaintiff;

f)      A declaration that CBP lacks authority to implement or collect any tariffs in the HTSUS that are based on the Challenged Orders with respect to Plaintiff;

g)      A permanent injunction enjoining operation of the Challenged Orders as applied to Plaintiff;

h)      A permanent injunction enjoining Defendants from imposing or enforcing any HTSUS tariffs based on the Challenged Orders against Plaintiff;

i)      An order requiring the United States to refund to Plaintiff all duties collected pursuant to the Challenged Orders on all relevant entries, whether liquidated or unliquidated, with pre- and post-judgment interest as allowed by law;

j)      An award of such other or further relief as the Court deems just and proper, including damages as appropriate;

k)      An award of Plaintiff's reasonable attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other applicable law; and

l)      Any additional relief the Court determines is proper.

Respectfully submitted,

/s/Michael Roll
Michael Roll
Roll & Harris LLP
2121 Avenue of the Stars, Suite 800
Los Angeles CA 90067
Phone: (310) 294-9501
Fax: (310) 857-6661
michael.roll@thetradelawfirm.com

Counsel for Plaintiff Global Consolidated Trading, Inc.

Dated: December 19, 2025